UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEVEN ERIC PARSONS,             )
                                 )
                  Plaintiff,     )
                                 )
        v.                       )        No. 4:10CV1089TIA
                                 )
MICHAEL ASTRUE, Commissioner     )
of Social Security,              )
                                 )
                  Defendant.     )

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration. The
parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.      Procedural History

Claimant Steven Eric Parsons filed Applications for Disability Insurance Benefits under
Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 92-96, 101-03)[1] and Supplemental Security
Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.
(Tr. 89-91,97-100). Claimant states that his disability began on August 8, 2005, as a result of
right wrist strain, status-post injury to his right arm, right carpal tunnel syndrome, hypertension,
arthritis and left leg strain. (Tr. 15, 121). On initial consideration, the Social Security
Administration denied Claimant's claims for benefits. (Tr. 43-47). Claimant requested a hearing
before an Administrative Law Judge ("ALJ"). (Tr. 51-52). On September 13, 2007, a hearing

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer
(Docket No. 12/filed August 30, 2010).

was held before an ALJ. (Tr. 27-49). Claimant testified and was represented by counsel. (Id.). Thereafter, on December 21, 2007, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 10-23). On April 30, 2010, after considering the additional medical records from John Cochran VA Medical Center and Vocational Rehabilitation, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 1-5, 491-1155). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Hearing on September 13, 2007

#### 1. Claimant's Testimony

At the hearing on September 13, 2007, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 27-49). Claimant is forty-eight years of age, and his date of birth is June 12, 1959. (Tr. 30). Claimant testified that he is five feet six inches tall and weighs 195 pounds. Claimant is right-handed. Claimant lives with his girlfriend's mother and his girlfriend. (Tr. 30). Claimant completed eleventh grade and received a GED. (Tr. 31). Claimant entered the United States Navy and became a certified welder. Claimant served in the Navy from 1977 until 1981 and receives non-service connected benefits through the VA as medical benefits. (Tr. 31).

Claimant testified that he last worked on August 5, 2005, as a material handler. (Tr. 31). Claimant left the job after a machine fell on his arm. (Tr. 32). Claimant's Worker's Compensation Claim is pending and for the first three months after the accident, Claimant collected seventy-five percent of his check from an insurance company. Before working as a

material handler, Claimant worked at Lehman Machine Corporation as a material handler and a forklift driver for eighteen months. Claimant worked in that position and left for better pay. (Tr. 32). Before working at Lehman, Claimant worked at Missouri Mechanical as a pipe fitter for three years. (Tr. 32-33). Claimant left that position when the business closed. (Tr. 33). Claimant worked at Quality Temps for a year. Claimant worked as a housekeeper at St. John's Mercy for over two years, and then at Woodland Manor as a housekeeping supervisor. Claimant left the position at St. John's after having a disagreement with his boss. (Tr. 33). As a supervisor, Claimant supervised nine people, ordered supplies, maintained the laundry and housekeeping departments, made schedules, and covered shifts as needed. (Tr. 46).

Claimant testified that he cannot work, because of his neuropathy and degenerative arthritis in his shoulders. (Tr. 33-34). Claimant testified that he has no sensation in his right hand and has difficulty holding onto larger objects with his right hand. (Tr. 34). Claimant testified that if he maintains his concentration, he is able to hold onto a box with both hands. Claimant has difficulty grasping and fingering with his right hand. (Tr. 34). Claimant testified that he cannot pick up a coin with his right hand and buttoning a shirt requires more time, and he usually uses his left hand. (Tr. 35). Claimant testified that he does not have a problem flexing or moving his hand. (Tr. 35). Claimant uses putty to exercise the muscles in his hand as directed by the occupational therapist or physical therapist. (Tr. 35-36).

Dr. Feinstein performed surgery on September 15, 2005 on his right hand after the accident. (Tr. 36). Claimant testified that Dr. Feinstein last treated him in January or February. (Tr. 36, 48). Dr. Feinstein placed work restrictions on Claimant's right hand including not having Claimant use hand tools, air tools, power tools and no prolonged bending. (Tr. 36). Claimant

testified that he has pain in his forearm. (Tr. 36). Claimant testified that bending his hand and fingers and taking a shower increases his pain. (Tr. 37). Claimant does not take pain medication for his pain. Claimant testified that not using his hand lessens the pain. (Tr. 37).

Claimant testified that he is currently treated at the VA for his neuropathy, and he last received treatment the day before the hearing. (Tr. 37). Claimant testified that the VA doctor indicated that she had exhausted all means of fixing his hand. (Tr. 37). Claimant testified that he has degenerative joint disease of his bilateral shoulders, and the condition prevents him from lifting anything above his shoulders. (Tr. 37-38). Claimant rated his shoulder pain at a level seven. (Tr. 38). Claimant testified that he did not know whether using a computer keyboard would impact his shoulder pain. Reaching out in front causes Claimant pain. Claimant testified that he does not take any pain medication for his shoulder pain. (Tr. 38).

Claimant testified that he had a compound fracture of his fibula in his left leg in 1996. (Tr. 39). Claimant received bone marrow injections as treatment. (Tr. 40). The bone pops out of place and causes Claimant to experience severe pain when he tries to get up and walk in the morning or stands for more than two hours. (Tr. 39). Walking more than three blocks causes Claimant pain. (Tr. 39). Claimant testified that he received disability benefits for a period of time. (Tr. 40). Claimant testified ulcers in his stomach make him bleed if he takes pain medication or any type of aspirin. Claimant takes Omeprazole, a generic of Prilosec, as treatment for the ulcers. (Tr. 40-41). Elevating and icing his ankle relieves his pain. (Tr. 41). Claimant testified that he elevates his ankle for six hours each day. (Tr. 41).

Claimant testified that since he completed the substance abuse program at the VA, he has not used any illegal drugs. (Tr. 41). Claimant last used illegal drugs and used alcohol in excess in

May 2006. (Tr. 41). Claimant testified that he experiences bouts of depression at least once a week. (Tr. 42). The depression causes him to have crying spells and not want to do anything. Claimant takes Paroxetine, a generic of Flosomax, as treatment. (Tr. 42). Dr. Ibe, at the VA, started treating Claimant for his depression in May 2006. (Tr. 43). Claimant testified that he currently in the substance abuse program at the VA. (Tr. 47). Claimant smokes a package of cigarettes each day. (Tr. 47).

Claimant testified that he lost his license in 1984 so he either takes the bus or arranges for a ride. (Tr. 43). Claimant attends AA meetings four times a week. (Tr. 43). Claimant does some laundry and some cooking. (Tr. 44). Every now and then Claimant takes out the trash. Claimant testified that he started using a cane in 1998 because using a cane lessens his pain. (Tr. 45).

As to his daily activities, Claimant testified that he wakes up in the morning around 8:00 and cooks breakfast. (Tr. 45). Claimant watches television, fixes lunch, and elevates his leg. Claimant testified that he attends AA meetings in the evening. (Tr. 45). Claimant testified that he has problems falling asleep, and he takes a generic for Seroquel to help him sleep. (Tr. 45-46). Claimant testified that he does some gardening including planting flowers and making the yard look prettier. (Tr. 47).

### 2. Forms Completed by Claimant

In the Disability Report - Adult, Claimant reported that he stopped working on August 8, 2005 after a job-related injury. (Tr. 121).

### III. Medical Records

On August 8, 2005, Claimant received treatment in the emergency room at Barnes-Jewish

Hospital for pain in his right forearm. (Tr. 148-50). Claimant reported being injured in a work-related accident when a machine fell on his right forearm and wrist. (Tr. 149). The x-rays showed soft tissue defects of the right wrist but no fracture observed. (Tr. 153-54).

On September 1, 2005, Dr. William Feinstein further evaluated Claimant's right wrist . (Tr. 168). Claimant reported numbness in his thumb, index finger, and the radial aspect of his middle finger. (Tr. 168). Dr. Feinstein diagnosed Claimant with complex right wrist laceration and probable median nerve injury and prescribed Keflex and recommended surgery for exploration, irrigation, and debridement of the right wrist wound with evaluation of the median nerve. Dr. Feinstein directed Claimant to remain off work until further notice. (Tr. 169).

On September 14, 2005, Dr. Feinstein performed debridement of skin, subcutaneous tissue, and tendon, flexor carpi tendon, and decompression and neurolysis of media nerve. (Tr. 166-67, 461-62). Dr. Feinstein included complex right wrist laceration with injuries to the palmaris longus tendon, carpi radlatis tendon, and scarring with wound contamination and carpal tunnel syndrome. (Tr. 166-67).

In a follow-up visit on September 28, 2005, Claimant reported feeling sensation returning to his hand. (Tr. 164). Dr. Feinstein prescribed hand therapy two to three times a week for four weeks for wrist and finger range of motion exercises and strengthening. (Tr. 164).

On October 28, 2005, Claimant reported improvement with hand therapy. (Tr. 162). Dr. Feinstein directed Claimant to continue therapy once or twice a week for three more weeks and indicated that Claimant could return to regular work duties on November 2, 2005. (Tr. 162).

In a follow-up visit on November 18, 2005 after debridement of skin, subcutaneous tissue and tendon including the palmaris longus tendon and carpal tunnel, Claimant reported he

continued to improve with hand therapy. (Tr. 160). Claimant reported his wrist being weak with certain motions especially wrist flexion. Examination showed a full range of motion. Dr. Feinstein discontinued Claimant from formal therapy and directed him to continue with home exercises and to resume activities as tolerated. Dr. Feinstein released Claimant to full regular and unrestricted duties. (Tr. 160).

In a letter dated December 12, 2005 directed to an insurance claims specialist, Dr. Feinstein opined that Claimant has "a permanent partial disability. His permanent partial disability rating is 5% at the level of the right wrist. He has no work restrictions."

On January 31, 2006, Dr. Joseph Hanaway, a neurologist, completed an EMG and nerve conduction studies and such studies showed significant median nerve sensory impairment in his right hand and carpal tunnel syndrome. (Tr. 180-84). The nerve conduction study showed Claimant has distal medial and ulnar nerve sensory neuropathy the result of impairment of normal nerve conductions because of a laceration of his right wrist. Dr. Hanaway found that Claimant has a serious neuropathy involving his right hand and opined "[t]here is really not a lot that can be done about this at the moment. He will have to wait and hope for further recovery. I will see him again in a couple of months." (Tr. 180-84).

In a follow-up visit on February 1. 2006, after being discharged from treatment two months earlier and released to regular duties, Claimant reported pain and difficulty lifting twenty-five pounds. (Tr. 157). Examination revealed no swelling or tenderness. Dr. Feinstein ordered electrodiagnostic studies to evaluate the median and ulnar nerves. Dr. Feinstein restricted Claimant's lifting to no more than twenty-five pounds. (Tr. 157, 467). Although scheduled for follow-up treatment, Claimant did not return for treatment. (Tr. 158, 455).

On February 6, 2006, of referral by Dr. Feinstein, Dr. Daniel Phillips, a neurologist, examined Claimant. (Tr. 173). Examination showed mild-moderate demyelinative right ulnar neuropathy across the elbow and mild demyelinative ulnar neuropathy across the wrist that likely represents residual from a previously more severe condition. Dr. Phillips noted that Claimant was asymptomatic in his left upper extremity. Testing showed the median sensory response voltages recorded from the index and middle fingers compare favorably to the contralateral values. (Tr. 173-75).

In a letter dated March 22, 2006, Dr. Joseph Hanaway, a neurologist, noted examining Claimant on January 23, 2006 and finding right carpal tunnel syndrome and impaired superficial sensory function of his right hand in the median and ulnar nerve distributions after reviewing his EMG testing. (Tr. 177, 179). Dr. Hanaway opined that because of this combination, Claimant has decreased sensation and carpal tunnel syndrome in his right hand. Dr. Hanaway opined that Claimant cannot use his right hand for repetitive movement, fine movements, gripping, holding onto hammers, screwdrivers, and wrenches; he cannot push and pull; and he cannot use power tools because the vibration would aggravate his carpal tunnel syndrome. Dr. Hanaway further opined that sensory nerves recover slower than motor nerves and noted that Claimant should be seen for follow-up treatment. (Tr. 177, 179).

From May 1, 2006 through June 7, 2006, Claimant received counseling for substance and alcohol abuse, treatment for depressive disorder, participated in group psychotherapy, and received psychiatric service/therapy numerous times each week at the VA. (Tr. 193-255). His diagnosis included alcohol dependence and depression. (Tr. 208). In the substance abuse history, Claimant reported receiving three to four DUIs over a two-year period and continuing to drink at

a heavy rate until April 25, 2006 when he planned to kill himself. (Tr. 249). Claimant started

using powdered cocaine in August 2005 and using as much as $600 a week since that time. (Tr.

249). Dr. Ibe, a staff psychiatrist at the VA, noted that Claimant had child support issues and

numerous jail sentences. (Tr. 209). Upon admission, Claimant indicated that he wanted to kill

himself with a gun and has been incarcerated for failure to pay child support. Claimant reported

drinking four to six beers, sometimes more, each day. (Tr. 209, 219). One of the doctor's noted

Claimant's GAF to be 50.[2] (Tr. 242, 250). The Domiciliary Clinical staff noted Claimant to be

homeless and jobless with a history of cocaine/alcohol dependence. (Tr. 216). Claimant reported

smoking one to two packages of cigarettes each day. (Tr. 219). Dr. Ibe placed Claimant on

suicidal precautions and prescribed medications for depression. (Tr. 210). Dr. Ibe discharged on

June 6, 2006, and prescribed medications and opined Claimant to be competent. (Tr. 210).

Claimant reported being able to work and planned to pursue employment as a welder or material

handler. (Tr. 212).

In the VA Domiciliary admission note of June 1, 2006, Dr. Ibe noted Claimant to be

homeless and jobless with a history of cocaine and alcohol abuse for the last thirty-five years. (Tr.

449-53). Although Claimant denied homicidal or suicidal ideations, Claimant reported having a

suicidal episode of attempting to pull trigger of a gun in his mouth. Claimant reported being

treated for depression. (Tr. 449). Claimant attended an aftercare group therapy session. (Tr.

448).

---

[2]A GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. revision 2000) (DSM-IV-TR). A GAF of 41-50 is indicative of serious symptoms or any serious impairments in social, occupational, or school functioning.

In the VA Domiciliary Vocational Rehabilitation note of June 6, 2006, the vocational rehabilitation specialist noted that Claimant had been admitted to the Domiciliary program on May 30, 2006. (Tr. 441). Claimant reported last working for Swing-A-Way Manufacturing and leaving his job after injuring his hand. (Tr. 442). Claimant reported being able to work and interested in working as a welder or material handler. The specialist found Claimant to be competitively employable but having some significant physical limitations secondary to an injury to his right hand in August 2005. (Tr. 442). Claimant received a staff warning for allowing visitors into Domiciliary smoking area prior to the authorized visiting hours and for failing to check in with staff pursuant to the policy. (Tr. 441).

In the June 8, 2006 Addiction Psychiatry Group Counseling Note, the Domiciliary assistant noted how Claimant had participated in the program for one month. (Tr. 430). Claimant reported losing his employment due to his alcohol and substance abuse. (Tr. 431).

In the June 15, 2006 Occupational Medicine Consultation note, Claimant reported his leisure activities to include "concerts, bowling, watch TV, camping, fishing, hunting, golf, watch football, baseball, and NASCAR racing on TV, hiking, read, rent videos, listen to music, out to eat, zoo, History Museum" and his hobbies to include "maintenance, remodeling, woodworking, cooking, gardening."  (Tr. 421). Claimant participated in group therapy. (Tr. 420).

On June 27, 2006, Dr. Raymond Dalton, evaluated Claimant's depression. (Tr. 315, 410). Claimant reported being on parole and having a sponsor in the 12 step program. (Tr. 316, 411). Dr. Dalton found Claimant to show insight about how to handle events and interactions prior to becoming angry. (Tr. 316, 411).

In the July 10, 2006 progress note, the occupational therapist noted how Claimant uses his

free time by lifting weights, riding a bike, sitting by the river and relaxing, attending AA meetings, and doing service work. (Tr. 436). In the Domiciliary note, Claimant reported hunting, fishing, and hiking as his recreational interests. (Tr. 400-02).

On July 11, 2006, Dr. Madhuri Subbaiah, a physician at the VA, scheduled a nerve conduction study with Dr. William Burke on July 20, 2006. (Tr. 302, 304-05, 400). After completing the nerve conduction study of Claimant's right hand and arm including segmental study of his right ulnar nerve, Dr. Burke found the results to be normal. (Tr. 303). Dr. Burke noted no electrophysiological evidence of neuropathy or entrapment neuropathy including carpal tunnel but he could not rule out radicular or vascular or functional causes of Claimant's symptoms. Dr. Burke recommended a radiological examination of Claimant's cervical spine in order to evaluate the circulation of his right hand and arm. (Tr. 303).

In the Psychiatric Review Technique completed on July 12, 2006, Dr. A. Kresheck found Claimant to have an affective disorder, substance addiction disorders, and depression. (Tr. 256-59, 264). Dr. Kresheck found there to be insufficient evidence to assess any functional limitations. (Tr. 266). In the consultants notes, Dr. Kresheck noted Claimant has a history of depression but not real treatment or hospitalization. (Tr. 268). Claimant failed to appear for a consultative examination on June 26, 2006 and failed to respond to the failure to appear letter. (Tr. 268, 270). Dr. Kresheck opined there to be insufficient evidence to make a current determination and recommended denial. (Tr. 268).

On July 20, 2006, Dr. William Burke, a staff neurologist at the VA, evaluated Claimant's right hand. (Tr. 393-94). Dr. Burke recommended a radiological examination of his cervical spine in order to evaluate the circulation in his right hand and arm. (Tr. 393-94).

On July 23, 2006, Claimant contacted the VA requesting a refill of his Lisinopril prescription. (Tr. 323). A registered nurse called Claimant back and informed him the prescription renewal would be considered during his next appointment on September 12, 2006, and Claimant should have enough medication to last until that time. (Tr. 324).

On July 23, 2006, Claimant received follow-up treatment with Dr. Ibe. (Tr. 324). Claimant reported doing well. (Tr. 327). Dr. Ibe recommended that Claimant continue individual psychotherapy. (Tr. 328).

On July 25, 2006, Claimant participated in orientation to Incentive Therapy at the VA. (Tr. 311). Claimant reported his goal to be "Return to welding or remolding homes, and Incentive Therapy would help him to return to the work force." (Tr. 311). Karen Wait, an occupational therapist, noted that Claimant would work four hours each day through the incentive therapy program, and he had to maintain at least a 95% attendance for four weeks. (Tr. 311).

The July 28, 2006, x-ray of Claimant's cervical spine showed mild degenerative changes over multiple cervical vertebral bodies, and no evidence of spinal stenosis or disc herniation. (Tr. 287). The July 27, 2006, x-ray of Claimant's cervical spine showed degenerative arthritis. (Tr. 288).

On August 10, 2006, Carlton Wiesner, a registered nurse at the VA, contacted Claimant regarding group therapy on September 6, 2006. (Tr. 299). Claimant requested to be scheduled. (Tr. 299). Claimant participated in the incentive therapy program and job seeking skills training course. (Tr. 437). Claimant reported shooting pool, going out to eat, lifting weights, walking, doing service work, attending AA meetings, and keeping a journal as his activities during free time. (Tr. 438).

In the August 10, 2006 Psychology note, Dr. Dalton found Claimant to be capable of sustaining as an employable outpatient. (Tr. 378-79). In follow-up treatment on August 30, 2006, Claimant reported feeling more depressed , but he cannot pin point why. (Tr. 370-73). Claimant indicated that he had been promised a job, and he would start working soon. (Tr. 373).

On September 5, 2006, the Domiciliary assistant noted how Claimant is in his fifth week of job searching, but he has made minimal effort to find a job. (Tr. 438). The assistant noted that Claimant uses his free time appropriately by exercising, riding a bike, watching television, and visiting friends. (Tr. 439).

In the September 6, 2006 Domiciliary note, Claimant reported numbness in his hands after riding a bike. (Tr. 365). A doctor prescribed naproxen as treatment. (Tr. 366).

On September 19, 2006, Claimant failed to notify the staff about a borrowed vehicle he drove onto the premises. (Tr. 362). The Domiciliary assistant issued a staff warning concerning the loaned vehicle in violation of the policy. (Tr. 362).

In the September 22, 2006 Domiciliary note, the assistant noted that Claimant has to provide proof of employment by September 25, 2006, or a start date for work. (Tr. 360). Claimant represented that he would start working on September 24, 2006. (Tr. 360).

In the Domiciliary note of September 26, 2006, a social worker at the VA noted how she explained to Claimant that he needed to obtain a letter from his employer verifying his hire and start date. (Tr. 356). Claimant expressed concern about disclosing his stay in the Domiciliary. Claimant reported to a Domiciliary assistant that he was unable to get written verification of his employment faxed to the Domiciliary, but that he would go to St. Patrick's Center and have the employer provide him with the needed information on Wednesday. The Domiciliary assistant

explained to Claimant that he would be discharged on Wednesday if he failed to provide the employer letter. Claimant indicated that he understood and would comply. (Tr. 356). Later that day, Claimant reported to the Domiciliary staff that there had been a miscommunication with the employer, and he would not start working until October 2, 2006, instead of September 25, 2006. (Tr. 357). A Domiciliary assistant once again reminded Claimant that he would be discharged from the program unless he provided written verification of employment and his start date. Claimant participated in therapy at the VA. (Tr. 357).

In the discharge summary of September 27, 2006, Dr. Ibe, the attending physician at Jefferson Barracks, listed depression and alcohol and cocaine dependence in remission as Claimant's diagnosis. (Tr. 280). Dr. Ibe noted that Claimant completed phases one and two of the domiciliary program and in phase three of the program when he exceeded the designated time frame for finding gainful employment. Dr. Ibe noted that Claimant was not forthcoming with appropriate information. (Tr. 280). Claimant's discharge medications included hydrochlorothiazide, metoprolol, mirtazapine, paroxetine, and ranitidine. (Tr. 281). Dr. Ibe opined Claimant to be competent in the VA sense of the word. (Tr. 281).

In the VA domiciliary note of September 27, 2006, Sandra Wayman, a domiciliary assistant, noted that Claimant had been discharged from the domiciliary program due to his failure to obtain employment in the allocated seven weeks for Job Search. (Tr. 355). Claimant reported having housing. (Tr. 355).

In a follow-up visit at the VA on December 4, 2006, Dr. Subbaiah advised Claimant to stop smoking. (Tr. 342-348).

In the VA psychiatry note of February 23, 2007, Claimant reported leaving the domiciliary

therapy program, because "he did not want to look for a job as he believes that he cannot hold any job an[*sic*] he is waiting for his case concerning his hand injury when he hopes that he will be compensated for the injury." (Tr. 339). Claimant reported no side effects from his medications. (Tr. 339).

On February 27, 2007, Dr. Feinstein completed an independent medical evaluation requested by AIG Claims Services. (Tr. 454). Dr. Feinstein noted that he first treated Claimant on September 1, 2005 for numbness in his thumb, index finger, and the radial aspect of his right middle finger. (Tr. 455). Dr. Feinstein diagnosed Claimant with a complex right wrist laceration with a central eschar and surrounding erythema with probable median nerve injury and prescribed oral antibiotics and recommended surgery for exploration, irrigation, and debridement of the wound with evaluation of the median nerve. While performing surgery on September 14, 2005, Dr. Feinstein found Claimant to have scar entrapment of the median nerve without nerve laceration and a complex right wrist injury with lacerations to the flexor carpi radialis tendon and palmaris longus tendon. Dr. Feinstein treated Claimant during his recovery until he found Claimant had attained maximum medical improvement on November 18, 2005 with a permanent partial disability rating of 5% at the level of the right wrist. Claimant returned on February 1, 2006, reporting increased pain and difficulty lifting more than twenty-five pounds. The electrodiagnostic studies showed "there is mild-moderate demyelinative right ulnar neuropathy across his elbow." (Tr. 455). Dr. Feinstein noted that Claimant did not return for a follow-up examination on February 15, 2006. (Tr. 455). Examination excellent grip strength and severely diminished sensation with two point discrimination testing throughout all fingers, and a full range of motion through Claimant's left arm, wrist, and hand. (Tr. 456). Dr. Feinstein's diagnoses

included complex right wrist laceration with injuries to palmaris longus tendon, carpi radialis tend and wound contamination; right hand carpal tunnel syndrome with scar compression of median nerve; right cubital tunnel syndrome; left carpal tunnel syndrome; and left cubital syndrome. Dr. Feinstein opined that he would not recommend additional medical treatment, but he agreed with Dr. Hanaway that Claimant does require some work restrictions such as fine manipulation with his right hand and from using hand tools, power tools, or air tools. Dr. Feinstein further opined that he would revise his permanent disability rating by increasing his disability rating from 5% to 15% at the level of the right wrist relative to the work-related injury on August 8, 2005. (Tr. 456).

On March 6, 2007, Claimant received follow-up treatment at the VA. (Tr. 331-36). Claimant reported riding a bicycle five time a week for 2.5 hours. (Tr. 336).

Claimant returned on July 23, 2007 for medication management. (Tr. 324-28). Claimant reported doing well with no specific complaints and having no side effects from his medications. (Tr. 327). Examination showed Claimant to be alert and oriented and with good concentration. (Tr. 328). Dr. Ibe refilled Claimant's medications. (Tr. 328).

During follow-up treatment on September 12, 2007, Claimant reported pain in the left distal fibula, numbness in the right hand, and requested a gym consultation. (Tr. 480-81). The staff physician found Claimant's neuropathy to be stable with no change and depression to be stable and ordered a follow-up x-ray for his distal fibular pain. (Tr. 483). The doctor urged Claimant to provide complete medical records and complete x-ray inasmuch as Claimant failed to complete the x-ray after last visit. (Tr. 484).

The September 19, 2007 radiology report of Claimant's tibia and fibula showed an old healed fractures distal left tibia and fibula. (Tr. 469, 503-04).

## IV.    The ALJ's Decision

The ALJ found that Claimant met the insured status requirements of the Act through June 30, 2009.  (Tr. 15).  The ALJ found that Claimant has not engaged in substantial gainful activity since August 8, 2005, the alleged onset date of disability.  The ALJ found that the medical evidence establishes that Claimant has the severe impairments of right wrist strain, status-post injury to his right arm, right carpal tunnel syndrome, and left leg strain.  (Tr. 15).  The ALJ opined that Claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations sufficient severity to prevent the performance of all sustained work activity is not credible.  (Tr. 16).  The ALJ determined that Claimant has the residual functional capacity to perform the full range of  work at the medium level of exertion except for work that involves lifting over fifty pounds.  (Tr. 16, 22).  The ALJ opined that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms not to be entirely credible.  (Tr. 17).  The ALJ found Claimant to be capable of performing his past relevant work as a forklift driver and housekeeper.  (Tr. 22).  The ALJ noted that Claimant's medical noncompliance detracts from the credibility of his allegations of disabling symptoms.  The ALJ concluded that Claimant is not under a disability from August 8, 2005 through the date of his decision.  (Tr. 22).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The claimant's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.	Any corroboration by third parties of the claimant's impairments.

6.	The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ failed to properly analyze the severity of Claimant's medically determinable impairments and find that his status post left wrist injury, depression, and mood disorder were not severe. Next, Claimant contends that the ALJ failed to properly formulate his RFC.

A.    ALJ's Finding Claimant's Impairments Not Severe

Claimant argues that the ALJ erred in determining that he has not submitted evidence of medically determinable impairments. As noted above, Claimant is disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months and which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinic and laboratory diagnostic techniques." Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987).

An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); 20 C.F.R. § 404.1521(a). Under the regulations, the ALJ evaluates the severity of mental impairments by gauging their impact on four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration persistence, or pace; and (4) episodes of decomposition. Cuthbert v. Astrue, 303 F. App'x 697, 699 (11th Cir. 2008); 20 C.F.R. § 404.1521a(c)(3). If the ALJ rates the claimant's limitations as "none" or "mild" in the first three areas, and "none" in the fourth area, the ALJ will generally conclude that the claimant's mental impairments are not severe - unless the evidence indicates that there is more than a minimal limitation in the claimant's ability to perform basic work activities. 20 C.F.R. §1520a(d)(1).

Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id.

After finding Claimant had the medically determinable mental impairment of cocaine and alcohol dependence, the ALJ analyzed the severity of that condition in accordance with the Commissioner's special technique. (Tr. 15). The ALJ found that such impairment did not cause more than minimal limitation in Claimant's ability to perform basic mental work activities on a twelve-month basis, and Claimant had a mild restriction of his activities of daily living, mild difficulties in social functioning and in concentration, persistence, and pace, and no episodes of decomposition. (Tr. 15).

Claimant contends that the ALJ erred by failing to consider depression and mood disorder to be medically determinable impairments. Claimant did not allege a mental impairment in his application. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression was later developed). At the hearing, Claimant testified about having bouts of depression and being treated with medications, but Claimant did not testify at the hearing that his depression affects his ability to function. The medical records shows a diagnosis and treatment of depression. The ALJ found Claimant to have a good response to his psychiatric medications and he failed to show a psychiatric condition that met the twelve-month durational requirement. The undersigned concludes that the ALJ did not err in discounting Claimant's mental impairments during the relevant period. See

Kirby v. Astrue, 500 F.3d 705, 707-09 (8th Cir. 2007) (impairment is not severe if it is only slight abnormality that would not significantly limit mental ability to do basic work activities; claimant bears the burden of establishing impairment's severity).

After being treated for suicidal ideation and complaints of depression at the VA Medical Center in May 2006, Claimant was discharged to normal activities and continued outpatient counseling for substance abuse/dependence. (Tr. 18-19). After treatment, Claimant was discharged to normal activities and continued outpatient counseling for substance abuse/dependence. (Tr. 18-19). The ALJ found that the medical evidence showed Claimant responded to psychiatric medication and the normal examination findings are factors inconsistent with a severe or disabling psychiatric condition on a twelve-month durational basis. (Tr. 20). The ALJ further noted that Claimant did not seek regular psychiatric treatment. (Tr. 20). Claimant noted being treated on June 6, 2006, February 23 and July 23, 2007. In the July 23, 2007 treatment note, Claimant reported doing well with no specific complaints and having no side effects from his medications, and examination showed Claimant to be alert and oriented and with good concentration. (Tr. 327-28). Claimant's reliance on medical evidence after December 21, 2007 is misplaced. Claimant has failed to show how such evidence addresses his condition before the close of the relevant period. Accordingly, substantial evidence supports the ALJ's decision not to consider depression and mood disorder to be medically determinable impairments.

The undersigned finds that the medical evidence supporting Claimant's left upper extremity to be impaired is dated March 2009, fifteen months after the ALJ issued his decision on December 21, 2007. The medical evidence in the relevant time period shows that Claimant did not have a severe impairment of his left wrist. On February 6, 2006, Dr. Phillips noted that Claimant was

asymptomatic in his left upper extremity. (Tr. 173). Indeed, during independent medical evaluation, Dr. Feinstein found Claimant to have a full range of motion through Claimant's left arm, wrist, and hand based on his examination. (Tr. 19, 456). Accordingly, the medical evidence during the relevant time period does not support a severe impairment of Claimant's left wrist.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.     Residual Functional Capacity

A claimant's RFC is what he can do despite his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id.

At the hearing, Claimant testified that he cannot work due to the neuropathy of his right hand, degenerative arthritis in his shoulders, a bad left leg, and depression. (Tr. 33-34, 42). Claimant testified regarding his difficulty in using his right hand for various activities and the work restrictions in the use of that hand. (Tr. 34-36). According to Claimant, he cannot lift anything above his shoulders or reach out in front and prolonged standing causes swelling and severe pain. (Tr. 38-39). Claimant reported taking no pain medication because of stomach ulcers. (Tr. 37-38, 40). Claimant testified to having bouts of depression at least once a week and taking antidepressant medication prescribed by Dr. Ibe. (Tr. 42).

In his decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing and objective medical evidence, the lack of prescription pain medications, Claimant's daily and social activities, history of low earnings, and failure to stop smoking. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective

complaints). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Further, the ALJ noted that despite his allegations of persistent pain, Claimant has not received ongoing medical attention or treatment.

In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on his daily activities, or functional limitations. Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported the ALJ's decision of no disability). Likewise, the ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition). The ALJ further noted that Claimant takes over-the-counter medications for pain, not narcotic pain relievers. See Masterson v. Barnhart, 363 F.3d 731, 739 (8th Cir. 2004) (ALJ properly considered that claimant did not take narcotic pain medication in finding her complaint of extreme pain not credible); Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (holding that pain which can be remedied or controlled with over-the-counter analgesics normally will not support a finding of disability).

The ALJ also properly considered the inconsistencies between Claimant's allegations and his activities. Claimant reported his leisure activities to include "concerts, bowling, watch TV, camping, fishing, hunting, golf, watch football, baseball, and NASCAR racing on TV, hiking, read, rent videos, listen to music, out to eat, zoo, History Museum" and his hobbies to include "maintenance, remodeling, woodworking, cooking, gardening." (Tr. 421). See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001) ("[i]consistencies between subjective complaints of pain and daily living patterns diminish credibility"); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his children on daily basis, drive car infrequently, and go grocery shopping occasionally). In a follow-up visit, Claimant reported using his free time by lifting weights, riding a bike five time a week for 2.5 hours, sitting by the river and relaxing, attending AA meetings, shooting pool, walking, and doing service work and hunting, fishing, and hiking as his recreational interests. (Tr. 336, 400-02, 436, 438). Further, the ALJ noted how by his own admission, Claimant is able to engage in a fair range of household chores and activities. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence."); See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding that activities such as driving, shopping, watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain). Indeed, Claimant testified at the hearing that his daily activities include doing hand exercises, attending AA meetings four times a week, sometimes walking in the morning, doing some laundry and cooking, going shopping, watching television, and gardening. The ALJ noted that Claimant's ability to walk casts doubt on his alleged inability to

stand and/or walk for extended periods of time. Further, the ALJ noted that Claimant's demonstrated ability capacity for such activities as gardening and woodworking and lacing a leather wallet to be inconsistent with his alleged inability to use his right hand for fine motor activities in addition to lifting, pushing, and pulling. Moreover, the ALJ opined that Claimant's appeared to function satisfactorily in dealing with other people as demonstrated by his attendance four times a week at AA meetings.

Further, the undersigned notes that Claimant continued to smoke cigarettes despite the fact that he was repeatedly advised by doctors to stop. The ALJ considered that Claimant was a longtime smoker; that Claimant continued to smoke a pack of cigarettes a day; that Claimant did not want to quit smoking even when offered assistance; and that his smoking is inconsistent with his allegations of disability. A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility. See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) (claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain);Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989) (holding that an ALJ can discredit subjective complaints of pain based on claimant's failure to follow a prescribed course of treatment). Additionally, subjective complaints of pain may be discredited where a claimant ceases to stop smoking upon a doctor's advice. See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to take prescription medications, seek treatment, and quit smoking."); Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 1996) (citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do not support a finding of disability,

and failure to follow a prescribed course of remedial treatment, including cessation of smoking, without good reason is grounds for denying an application of benefits). Therefore, Claimant's failure to cease smoking, despite recommendations that he do so over the course of several years, detracts from his claim that he is unable to engage in substantial gainful employment.

Next, the ALJ considered Claimant's criminal history and history of polysubstance abuse. Claimant has felony convictions for forgery and nonpayment of child support.

Claimant also testified at the hearing that he has to use a cane for ambulation, but there is no objective medical evidence substantiating Claimant's need to use a cane. See e.g., Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). Indeed, the record shows that there is no objective medical evidence substantiating Claimant's need to use a cane. Further, the record shows Claimant never reported to any doctors his need to use a cane. Likewise, no doctor determined Claimant needed to use a cane for ambulation as a medical necessity. Thus, if Claimant was not using a cane for ambulation out of medical necessity, he must be doing so out of choice. See Craig v. Chater, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); Cf. Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). These observations are supported by substantial evidence on the record as a whole.

Finally, the ALJ noted that Claimant's work history and earnings record severely detract from her credibility regarding the severity of her impairments alleged and her overall motivation to

work versus motivation for benefits inasmuch as her record documents poor and overall inconsistent earnings. The ALJ noted that Claimant reported no earnings in 1991, 1992, 1996, 2002, and 2006. (Tr. 112-15). A poor work history lessens a Claimant's credibility. Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993); see also Ramirez v. Barnhart, 292 F.3d 576, 581-82 (8th Cir. 2002) (poor work record and financial motivation for benefits may contribute to adverse credibility determination when other factors cast doubt upon claimant's credibility); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (a poor work history "may indicate a lack of motivation to work, rather than a lack of ability."). Further, Claimant had been able to work after his work related injury despite his alleged disability. See Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (low earnings and significant breaks in employment cast doubt on complaints of disabling symptoms). The ALJ noted how Claimant accepted a full-time job in October 2006. (Tr. 21, 357). Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability).

In support of his credibility findings, the ALJ noted that Claimant's impairments were controlled with treatment, see Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability."); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (noting that if impairment can be controlled by treatment, it cannot be considered disabling); see also Brown v. Barnhart, 390 F.3d

535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") , and that no physician who examined Claimant found him to have limitations consistent with disability.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work.").  The lack of medical evidence supporting Claimant's complaints was a proper consideration when evaluating his credibility, see Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006), as was his failure to pursue more aggressive treatment.  See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999).  On September 14, 2005, Dr. Feinstein performed debridement of skin, subcutaneous tissue, and tendon, flexor carpi tendon, and decompression and neurolysis of media nerve.  In a follow-up visit on October 28, 2005, Claimant reported improvement with hand therapy two to three times week.  (Tr. 162).  Dr. Feinstein released Claimant to regular work duties on November 2, 2005.  (Tr. 162).  In a follow-up visit on November 18, 2005, Claimant reported he continued to improve with hand therapy.  (Tr. 160).  Dr. Feinstein released Claimant to full regular and unrestricted duties.  (Tr. 160).  In a letter dated December 12, 2005, Dr. Feinstein opined that Claimant has no work restrictions.   In a follow-up visit on February 1. 2006, Claimant reported pain and difficulty lifting twenty-five pounds.  (Tr. 157).  Dr. Feinstein ordered electrodiagnostic studies to evaluate the median and ulnar nerves and restricted Claimant's lifting to no more than twenty-five pounds.  (Tr. 157, 467).  Although scheduled for follow-up treatment, Claimant did not return for treatment.  (Tr. 158, 455).  On February 27, 2007, Dr. Feinstein completed an independent evaluation and opined that he would not recommend additional medical treatment, but he agreed with Dr. Hanaway that Claimant does require some work restrictions such as fine manipulation with his right hand and

from using hand tools, power tools, or air tools. (Tr. 456).

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record."). In relevant part, the ALJ opined as follows:

> Nothing stated in this decision is meant to suggest or imply that the claimant does not have genuine medical problems with some functional limitations. However, based upon the totality of the evidence and giving the claimant the benefit of the doubt as to the severity of his impairments, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform work except for work that involves lifting over fifty pounds. The medical evidence does not establish the existence of any other persistent, significant, and adverse limitation of function due to any other ailment. This residual functional capacity is supported by the collective medical records of Doctors Subbaiah, Feinstein, Onuka, and Phillips.

(Tr. 22).

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by

this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's minimal, ongoing treatment, his lack of functional restrictions by any physicians, his daily activities, and history of low earnings. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of pain. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

Claimant's contention that the ALJ failed to compare his residual functional capacity with

the actual functional demands of his past relevant work as forklift driver is without merit. At the hearing, Claimant testified that he drove a forklift for eighteen months, and that while working on August 8, 2005, he sustained an injury to his right wrist when handling a load of boxes with the forklift. (Tr. 32, 167). The ALJ found Claimant to be capable of performing his past relevant work as a forklift driver (operating foot controls) and a housekeeper job including supervisory duties. (Tr. 22). The ALJ noted that neither job as generally performed in the national economy involves lifting as much as fifty pounds. (Tr. 22). The Dictionary of Occupational Titles (DOT) classifies jobs in part with a physical demands rating. The rating system assigns a rating of "sedentary," "light," "medium," "heavy," or "very heavy" to each job the DOT lists. According to the DOT, the job of forklift driver (921.683-050) requires "medium" physical demand. The DOT indicates in relevant part that operating a forklift requires the ability to move levers and press pedals to drive truck and control movement of lifting apparatus with a medium exertional level(lifting 20 to 50 pounds occasionally and 10 to 25 pounds frequently). The undersigned finds that the ALJ committed no error in so identifying the demands of Claimant's past relevant work by "referr[ing] to the specific job descriptions in the [DOT], ..., for a definition of [claimant's] job as it is performed in the national economy." See Sells v. Shalala, 48 F.3d 1044, 1047 (8th Cir. 1995). The ALJ then correctly compared the demands of Claimant's past relevant work as a forklift driver with the finding the ALJ made regarding Claimant's residual functional capacity, the latter finding being supported by substantial evidence on the records as a whole.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that

would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

C.     New Evidence Before the Appeals Council

Claimant obtained treatment and records from John Cochran VA Medical Center and Vocational Rehabilitation after the ALJ issued his decision.  (Tr. 4, 491-1155).  Records of that treatment were submitted to the Appeals Council.  The Appeals Council stated that it had considered the additional evidence from John Cochran VA Medical Center and Vocational Rehabilitation and determined that it did not provide a basis for changing the ALJ's decision.  (Tr. 1-5, 491-1155).

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision.  20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).  Additional evidence submitted to the Appeals Council is material when it is "relevant to the claimant's condition for the time period for which benefits were denied."  Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)).  The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record.  Cunningham, 222 F.3d at 500.  This Court does not review the Appeal Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination.  Cunningham, 222 F.3d at 500.

The Eighth Circuit interprets a statement by the Appeals Council that additional evidence "did not provide a basis for changing the ALJ's decision" as a finding that the additional evidence

in question was not material. <u>Aulston v. Astrue</u>, 277 F. App'x 663, 664 (8th Cir. 2008) (citing <u>Bergmann</u>, 207 F.3d at 1069-70) (noting that whether additional evidence meets criteria of materiality is a question of law that courts review de novo).

Although the Appeals Council denied Claimant's request for review without comment, records reflect that the Appeals Council received the additional records; that it made them part of the record; that it considered these records; and that it concluded that these records did not provide a basis for changing the decision of the ALJ. (Tr. 1-5). After careful review, the Court concludes that the medical records submitted to the Appeals Council do not relate to the period on or before December 21, 2007. The additional records submitted to the Appeals Council address Claimant's condition and document his medical treatment received after the ALJ issued his decision. <u>See e.g.</u> <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1026 (8th Cir. 2007) (finding no error in Appeals Council's decision that new records prepared seven months after ALJ's decision described claimant's condition on date records were prepared, not on earlier date, and consequently were not material). The Regulations provide that an application is effective through the date of the ALJ's decision. 20 C.F.R. § 404.620.

The additional records support the ALJ's determination that Claimant is not disabled. If the limitations set out in the new medical evidence indeed persist, Claimant's recourse is to file a new application for benefits, alleging an onset of disability after the date of the ALJ's decision in this case. <u>See</u> <u>Riley v. Shalala</u>, 18 F.3d 619, 623 (8th Cir. 1994).

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." <u>Wiese v.</u>

<u>Astrue</u>, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." <u>Id.</u> (quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996). Accordingly, the Court affirms the ALJ's decision.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.


          /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of September, 2011.